# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CR-25-341-D |
| CLEVELAND DAVID HALL, II, | ) ) ) |
| Defendant. | ) |

## **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**

Before the Court is Defendant's "Motion to Suppress Evidence Obtained as the Result of an Ill[e]gally Prolonged Detention and Brief in Support" [Doc. No. 27]. The government filed a response opposing Defendant's motion [Doc. No. 38].

On November 19, 2025, the Court held a hearing on Defendant's motion to suppress at which Defendant appeared personally and through appointed counsel, Michael W. Noland. The government appeared through Assistant United States Attorney Stephen Hoch, and presented three witnesses, Oklahoma County Deputy Sheriff Jonathan Williams, Oklahoma City Police Department Master Sargeant Charles Seale, and Oklahoma County Sheriff's Department Lieutenant Jason Hefley. The government also introduced four exhibits previously submitted with its brief [Doc. Nos. 38-1, 38-2, 38-3, 38-4], three of which are video recordings made by the officers' body-worn cameras. The defense also introduced two exhibits previously submitted with its brief [Doc. Nos. 27-1, 27-2], one of which is a video recording made by an officer's body-worn camera. The Court has viewed all videos in their entirety. The Court took the motion under advisement. Upon

1

consideration of the evidence, the case record, and the parties' arguments, the Court finds and rules as follows.

## FINDINGS OF FACT

The Indictment charges Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). It alleges that on or about August 5, 2025, in the Western District of Oklahoma, Defendant, with knowledge that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed a firearm.[1] *See* Indictment [Doc. No. 8]. Defendant moves to suppress any fruits from the search of Defendant's rental vehicle pursuant to a traffic stop conducted on that date. Defendant argues that the traffic stop was unconstitutionally extended past the time necessary to issue the speeding ticket.[2] The evidence received establishes the following facts pertinent to Defendant's motion, as found by the Court.

Deputy Williams has over five years of experience working for the Oklahoma County Sheriff's Department and is currently assigned to the Criminal Interdiction Team of Central Oklahoma (CITCO) unit. Just before 8:30 on the morning of August 5, 2025, Deputy Williams observed a white Jeep Grand Wagoneer with an Alabama license plate traveling westbound on I-40 at 9 miles per hour over the posted speed limit. He pulled the vehicle over. Deputy Williams approached the vehicle and discovered the sole occupant,

---

[1] Specifically, the firearm was a CZ, model TT45, .45 ACP caliber pistol, bearing serial number C00615, which was in and affecting interstate or foreign commerce in that said firearm had previously crossed state lines to reach Oklahoma.

[2] Defendant initially also challenged the reliability of the two drug dogs that were deployed on Defendant's vehicle arguing that the officers did not have probable cause to search the car. But the parties stipulated at the hearing that this is no longer at issue.

Cleveland David Hall, II, in the driver's seat. Defendant provided Deputy Williams his Georgia-issued driver's license along with a rental agreement for the vehicle.[3] Deputy Williams asked Defendant where he was traveling to, but Defendant did not provide a clear answer.

Deputy Williams then instructed Defendant to get out of the vehicle and follow him to his patrol vehicle so he could run his license through the computer. Before going to the patrol vehicle, Deputy Williams asked Defendant whether he had any weapons on him. Defendant stated that he had a gun in the vehicle and Deputy Williams told him to leave it there. Defendant then asked whether he was under arrest; Deputy Williams responded "no," but he was being detained. Before stepping into the patrol vehicle, Defendant retrieved the vehicle keys from his pocket and locked his car.

Once in the patrol vehicle, Deputy Williams began running Defendant's license and engaging in casual conversation with Defendant. Deputy Williams asked Defendant whether he was a convicted felon and Defendant responded "no, look it up." After this question, Defendant's demeanor changed—he began to sigh when asked questions.

Master Sargeant Charles Seale—another member of the CITCO team with over 19 years of experience working for the Oklahoma City Police Department—then arrived on scene to see if Deputy Williams needed assistance. Deputy Williams told Defendant that he was having issues running his information and asked whether he had marijuana in the

---

[3] The first rental agreement provided by Defendant was expired. When Deputy Williams inquired into this, Defendant explained that he extended the rental period and provided an updated rental agreement, which was also expired.

vehicle. Defendant responded "no." But when asked further questions, Defendant stopped replying. Deputy Williams then asked Defendant why he was shutting down and Defendant responded that he was waiting for his information to be run. When asked where he was traveling to, Defendant responded that he was not traveling to Oklahoma, and when asked whether there was anything illegal in the vehicle, he did not respond. Deputy Williams then asked Defendant whether he had methamphetamine, cocaine, heroin, marijuana, or U.S. currency totaling over $10,000.00 in the vehicle, and Defendant did not respond. Defendant again asked whether he was under arrest and Deputy Williams stated that he was just being detained. Defendant asked whether he had warrants and Deputy Williams explained that he was still trying to determine that. He then told Defendant that he was suspicious of his travel and was going to have a drug dog deployed on his car.

    Because Deputy Williams was unable to determine whether Defendant was a convicted felon when he ran his information,[4] he gave Defendant's license to Msgt. Seale and asked him to check for information about Defendant. Deputy Williams then called Sargeant Travis Teague to bring his drug dog to the scene to be deployed on Defendant's vehicle. At this point, approximately 13 minutes had passed since the initial traffic stop took place. It took Sgt. Teague and his drug dog approximately 8 minutes to arrive on scene; meanwhile, Msgt. Seale was in his own patrol vehicle running Defendant's license.

---

[4] Throughout the duration of the stop, various technical complications beyond the officers' control interfered with their efforts to obtain a complete indication of Defendant's criminal history.

4

When Sgt. Teague arrived and began walking his drug dog around Defendant's car, Msgt. Seale relayed to Deputy Williams the information he could find on Defendant—Defendant had several previous drug-related encounters with law enforcement, three active DEA investigations, and was involved in a large cocaine seizure in 2012. He could not determine whether Defendant was a convicted felon. Sgt. Teague then approached the two officers and explained that his drug dog did not alert on Defendant's vehicle.

The three officers then discussed their next steps, and Msgt. Seale offered to conduct a different search of Defendant's information. They all returned to their respective patrol vehicles, and Deputy Williams again asked Defendant whether he was a convicted felon. Defendant only responded by asking whether he was under arrest. Deputy Williams emphasized to Defendant that if he was not a convicted felon, he would be able to get him on the road much faster. At this point, approximately 30 minutes had passed since the initial traffic stop.

Msgt. Seale was still unable to determine whether Defendant was a convicted felon. Deputy Williams retrieved Defendant's license from Msgt. Seale so he could call his dispatch to see if they could gather any information.[5] Lieutenant Jason Hefley then arrived on the scene with his drug dog and asked Deputy Williams if he needed assistance. Deputy Williams explained to Lt. Hefley that Sgt. Teague walked his dog around Defendant's car and the dog did not alert. But Sgt. Teague's dog was not trained to alert on marijuana, and

---

[5] While Deputy Williams was on the phone with dispatch, he explained that he needed to determine whether Defendant was a convicted felon because if he was not, he needed to get him back on the road.

5

Lt. Hefley's dog was.[6] Deputy Williams then asked Lt. Hefley to deploy his dog on Defendant's vehicle. Lt. Hefley agreed to do so. Approximately 40 minutes after the initial traffic stop, Lt. Hefley stated that his dog alerted on Defendant's vehicle. The officers then determined that probable cause existed to search Defendant's car.

Upon searching the vehicle, the following items were found: (1) a suitcase containing 55 rubber-banded-bundles of U.S. currency; (2) a "CZ" brand firearm, with a .45 caliber magazine loaded with 9 rounds of ammunition (later determined to be stolen), identifying papers from the IRS with Defendant's name on them, 2 paper bindles in a large baggy containing a substance that field-tested positive for methamphetamine, and loose rubber bands; (3) 2 cell phones; and (4) a black wallet containing $15,000.00 in 3 rubber-banded-bundles in $100.00 denominations and several debit cards. The total amount of money recovered was $400,835.00. The entire stop lasted approximately 45 minutes.

## CONCLUSIONS OF LAW

"Under the Fourth Amendment, searches and seizures must be reasonable." *United States v. Torres*, 987 F.3d 893, 901 (10th Cir. 2021) (citing *United States v. Gomez-Arzate*, 981 F.3d 832, 838 (10th Cir. 2020)). "A traffic stop . . . constitutes a 'seizure' under the Fourth Amendment and is subject to review for reasonableness." *United States v. Mayville*,

---

[6] In his briefing, Defendant also argues that if either of the drug dogs did not alert in accordance with their training, then the officers did not have probable cause to search Defendant's car. But at the hearing, the parties stipulated that this also was no longer at issue, and counsel for Defendant confirmed that he was not disputing that the second dog alerted on Defendant's car. *See United States v. Villa*, 589 F.3d 1334, 1341 (10th Cir. 2009) ("[I]t is well-established that a dog sniff provides the requisite probable cause to search a vehicle for drugs.").

955 F.3d 825, 829 (10th Cir. 2020) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). "[T]he government bears the burden of proving the reasonableness of a . . . seizure." *United States v. Kitchell*, 653 F.3d 1206, 1216 (citing *United States v. Chavez*, 534 F.3d 1338, 1343 (10th Cir. 2008)).

"A traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to 'the mission of the stop itself.'" *United States v. Cone*, 868 F.3d 1150, 1152 (10th Cir. 2017) (citing *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)).

"A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *Kitchell*, 653 F.3d at 1216 (quoting *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009)). Defendant does not challenge whether the traffic stop was justified. Rather, he challenges the reasonableness of the stop, arguing that the length was impermissibly prolonged. *See* Def.'s Motion [Doc. No. 27, at 8].

"An officer's authority to seize a driver 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *Mayville*, 955 F.3d at 830 (citing *Rodriguez*, 575 U.S. at 354). "[A]n officer's mission during a traffic stop is both 'to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* (emphasis omitted). "[T]his mission 'includes ordinary inquiries incident to' the traffic stop, which typically involve inspecting the driver's license, verifying the vehicle's

registration and insurance coverage, and checking for any outstanding warrants against the driver." *Id.* (citing *Rodriguez*, 575 F.3d at 355).

"Because . . . traffic stops are especially fraught with danger to police officers, the Court has also included 'negligibly burdensome' inquiries an officer needs to make 'to complete his mission safely' among permissible actions incident to a traffic stop." *Id.* (citations omitted). The Tenth Circuit "has routinely permitted officers to conduct criminal-history checks during traffic stops in the interest of officer safety." *Id.* (citations omitted). "In determining whether the duration of a traffic stop was reasonable, we consider whether the officers diligently pursued the mission of the stop." *Id.* at 31 (citing *Rodriguez*, 575 U.S. at 357).

After considering the testimony from Deputy Williams, Msgt. Seale, and Lt. Hefley, and reviewing the body-worn camera footage of each officer, the Court finds that the traffic stop was not impermissibly prolonged. Although this stop may have lasted longer than an average stop, it is clear that the officers were "diligently pursu[ing] the mission of the stop." *Id.* Within the first few minutes of the stop, Defendant made clear to Deputy Williams that he was in possession of a gun, but he would not reveal whether he had been convicted of a felony. The steps Deputy William took to determine whether Defendant had any outstanding warrants or felony convictions are plainly within the bounds of the Fourth Amendment. *See e.g.*, *United States v. Mayville*, 955 F.3d 825 (10th Cir. 2020).

Throughout the entirety of the stop, the officers were working to gather information regarding Defendant's criminal history and whether he had been convicted of any felony offenses—police conduct consistent with the Constitution and 10th Circuit precedent.

When the officers were presented with difficulties running Defendant's information, they continuously tried different databases and dispatch services to retrieve such information. Further, Deputy Williams can be heard on the body-worn camera audio telling his dispatch that it is important that he determine whether Defendant is a convicted felon because if he is not, he needs to get him back on the road. These actions are indicative of diligent police work.

Defendant analogizes his case to both *United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022) and *Rodriguez*.[7] But in *Frazier*, the officer immediately began calling for a drug dog to come to the scene rather than begin the standard traffic-related protocols. *Frazier*, 30 F.4th at 1171. And in *Rodriguez*, the officer first issued the traffic citation and then conducted the canine free-air sniff which prolonged the stop. *Rodriguez*, 575 U.S. at 352-53. Not so here. Deputy Williams walked Defendant to his patrol vehicle and immediately began running his license and attempting to obtain background information. The drug dog was called as other officers were continuing to run Defendant's information and did not itself extend the duration of the traffic stop.

For these reasons, the Court finds that the officers were diligently pursuing the traffic stop and therefore did not unreasonably extend it longer than necessary. The government has met its burden to establish that the length of the traffic stop was reasonable.

---

[7] During the hearing, the defense also cited *United States v. Tyler*, No. 5:23-cr-00092-PRW-1 (W.D. Okla. 2023), but the Court finds this case to be inapposite.

**IT IS THEREFORE ORDERED** that Defendant's "Motion to Suppress Evidence Obtained as the Result of an Ill[e]gally Prolonged Detention and Brief in Support" [Doc. No. 27] is **DENIED**.

**IT IS SO ORDERED** this 5th day of December, 2025.

TIMOTHY D. DeGIUSTI
Chief United States District Judge